UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DIRK N. PAULIN                                           CIVIL ACTION

VERSUS                                                      NO. 19-14748

UNITED STATES DEPARTMENT OF                SECTION "R" (3)
HOMELAND SECURITY


## ORDER AND REASONS


Before the Court are defendant Alejandro Mayorkas, Secretary of the
United States Department of Homeland Security's[1] motions for summary
judgment on plaintiff's retaliation claim under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e, *et seq*.[2]  Plaintiff opposes the motions.[3]  For
the following reasons, the Court denies defendant's summary-judgment
motion on exhaustion,[4] and grants defendant's summary-judgment motion
as to liability.[5]

---

[1]     FEMA is part of the Department of Homeland Security.  Alejandro
        Mayorkas, the named defendant, is the current Secretary of the
        Department.
[2]     R. Docs. 41 & 42.
[3]     R. Doc. 47.
[4]     R. Doc. 41.
[5]     R. Doc. 42.

# I.     BACKGROUND

This case arises from allegations of retaliation under Title VII.  Plaintiff Dirk Paulin was assigned to the Federal Emergency Management Agency's ("FEMA") Louisiana Integrated Recovery Office ("LIRO") in New Orleans from 2006 to 2019.[6]   During his assignment, plaintiff was supervised by LIRO's Infrastructure Branch Director, Eddie Williams.[7]  In 2009, 2012, and 2013, plaintiff filed three EEO complaints of discrimination against FEMA, alleging that Williams was the responsible management official.[8]

FEMA employees like Paulin who work in "Public Assistance" hold two job titles.  First, employees hold a "hire-in" job title, which determines their grade and pay scale.[9]   Employees also hold a second title under FEMA's Qualification System "(FQS"), an internal system the agency uses to classify its employees.[10]   An employee's FQS title determines "the type of work, deployments, and supervisory responsibilities [employees] are assigned on a daily basis."[11]  Under FEMA's promotional system, completing a "task book"

---

[6]     R. Doc. 1 ¶ 30.
[7]     R. Doc. 47-4 at 3 (Williams Deposition at 15:1-25).
[8]     R. Doc. 47-1 at 15; R. Doc. 47-2 ¶ 4 (Paulin Declaration).
[9]     R. Doc. 47-2 ¶ 5 (Paulin Declaration).
[10]    *Id.*
[11]    *Id.*; *see also* R. Doc. 42-5 at 15-16 (Williams Deposition at 164:21-165:2) (explaining that, under FEMA's "organizational structure," employees' FQS titles determined whether they were "qualified" for a deployment).

is how an employee qualifies for a promotion to a new FQS position.[12] Employees are considered "qualified" in their FQS position once they complete the "task book" that corresponds with that position.[13] A task book "consists of pre-defined training, job tasks, and experiences that must be completed for the employee to advance to the next higher FQS position[,] and to become eligible for more complex and supervisory deployments."[14] The employee's actual promotion occurs upon completion of the task book.[15] Once an employee becomes "qualified" for a position after completing the relevant task book, the employee can then receive from FEMA management a new task book that corresponds with the next most senior FQS position, and can become a "candidate" or "trainee" for that position.[16]

In 2017, FEMA restructured its FQS system in an attempt to unify an employee's hired-in title and FQS title.[17] The purpose of FQS titles remains the same under both the "Old FQS Delivery Model" and the "New FQS

---

[12]   R. Doc. 1 ¶ 45.

[13]   R. Doc. 47-2 ¶¶ 5-10 (Paulin Declaration).

[14]   R. Doc. 47 at 4.

[15]   *Id.*

[16]   *Id.*; *see also* R. Doc. 47-6 at 2 (Williams Affidavit) ("Once the FQS title was established, the only way Mr. Paulin is able to request and obtain a new FQS title is to complete the currently assigned position task book and be qualified.  Then he would have to make a request to the HQ PA Cadre Manager to receive a new task book for a Task Force Leader.").

[17]   R. Doc. 47-4 at 10 (Williams Deposition at 66:10-25).

Delivery Model," but each employee received a new FQS title as part of the restructuring.[18]  Williams was directed by FEMA management to assign new task books and titles under the New FQS Delivery Model to employees who were under Williams's direct supervision.[19]  Williams was advised to make the assignments based on "the individual's current and []past position titles and to correlate them to the task[s] of the new positions."[20]

Under the Old FQS Delivery Model, Paulin was "qualified" for the position of "Public Assistance Coordinator Lead" or "PAC Lead."[21] Additionally, plaintiff had an open task book for the old-model position of "Public Assistance Task Force Leader."[22]  As a qualified PAC Lead, Paulin had project specialists reporting to him, and he in turn reported to a TFL.  In the new model, FEMA eliminated the intermediary PAC position, and instead created the "Program Delivery Manager" or "PDMG" position, which reported directly to the TFLs.[23]  Under this new model, Williams appointed Paulin to the "PDMG" position as a "trainee." Accordingly, Williams opened

---

[18]    R. Doc. 47-2 ¶ 13 (Paulin Declaration).
[19]    R. Doc. 47-4 at 3 (Williams Deposition at 15:1-7).
[20]    *Id.* at 6 (Williams Deposition at 32:6-11).
[21]    R. Doc. 47-3 at 1-2 (Qualification System Rating).
[22]    R. Doc. 47-2 ¶ 13 (Paulin Declaration); R. Doc. 47-14 at 2 (Paulin DTS Record).
[23]    R. Doc. 42-9 at 8 (Snyder Deposition at 41:14-19); R. Doc. 47-12 at 3-4 (Harrison Deposition at 48:18-49:23).

a PDMG task book instead of a Task Force Leader ("TFL") task book for Paulin.[24]  Paulin attests that he learned that Williams refused to open his TFL task book under the new model when he reviewed his Deployment Tracker System ("DTS") report on February 1, 2018.[25]

Paulin contends that the practical effect of Williams's decision was to "constructively demote" Paulin to a "non-supervisory position in which he could not even deploy or train in the supervisory Task Force Leader position," and instead would have to deploy in the PDMG position until he completed that task book.[26]  When asked what he thought motivated Williams's decision regarding the TFL task book, Paulin did not mention retaliation and said that he believed Williams "did not want [him] to advance," and instead "wanted to be in control of [his] career and life."[27]

Plaintiff also claims that Williams retaliated against him by not selecting him for a deployment.[28]  In August 2017, FEMA asked employees to volunteer to deploy to Houston, Texas to assist with Hurricane Harvey

---

[24]   R. Doc. 47-2 ¶ 14 (Paulin Declaration); R. Doc. 47-6 at 2 (Williams Affidavit).

[25]   R. Doc. 47-2 ¶ 14 (Paulin Declaration).

[26]   R. Doc. 47-1 ¶ 27.

[27]   R. Doc. 47-7 at 5 (Paulin Deposition at 69:3-14).

[28]   R. Doc. 1 ¶¶ 83-84.

relief efforts.[29]   Paulin volunteered for this deployment.[30]   Williams was responsible for selecting individuals for the deployment, and did not select plaintiff.[31]   Plaintiff concedes that his FQS title rendered him ineligible for consideration, but contends that he would have been eligible if Williams had not revoked his prior TFL task book and refused to reopen that task book under the New FQS Delivery Model.[32]

Plaintiff states that, in 2019, he was "finally able to voluntarily transfer" from LIRO to FEMA's national headquarters.[33]   The Government represents that since this suit was filed, plaintiff has filed another EEO complaint against six of his new supervisors in Washington, D.C. that allegedly relates to his protected activities against Williams.[34]

On November 29, 2017, Paulin filed a formal EEO complaint, alleging that Williams retaliated against him and discriminated against him based on his sex[35] when Williams selected two women to deploy to Hurricane Harvey

---

[29]   R. Doc. 47-2 ¶ 18 (Paulin Declaration).

[30]   *Id.*

[31]   *Id.*

[32]   R. Doc. 47-1 at 14-15.

[33]   R. Doc. 47 at 8.

[34]   R. Doc. 52 at 6.

[35]   Plaintiff has dropped his EEO complaint of sex discrimination in this lawsuit.  R. Doc. 42-4 at 3 (Paulin Deposition at 17:3-7).

instead of Paulin.[36]   On March 16, 2018, plaintiff, through his counsel, amended his EEO complaint to include the following claim: "On February 1, 2018, the complainant first became aware that Mr. Williams purposely refused or failed to open a task book for him under the New Delivery Model title of Task Force Lead Program Delivery Manager."[37]  Plaintiff asserted that the amendment was timely for three reasons: (1) because it is related to Paulin's original complaint; (2) because the claim related to a continuing act of retaliation and discrimination that was ongoing; and (3) because Paulin "only learned of Mr. Williams's purposeful refusal or failure to open the task book on February 1, 2018, and th[e] amendment [was] made within 45 days of that discovery."[38]

FEMA opened an investigation into Paulin's claims that Williams retaliated against him by: (1) not selecting him for deployment during Hurricane Harvey, and (2) refusing to open a TFL task book for Paulin under the New FQS Delivery Model.[39]   On August 30, 2018, FEMA concluded its investigation, and on September 24, 2019, the Department of Homeland Security's Office for Civil Rights and Civil Liberties dismissed plaintiff's

---

[36]   R. Doc. 47 at 11; *see also* R. Doc. 47-9 at 1-2 (First Amendment to Assert Related Claim).

[37]   R. Doc. 41-4 at 2 (Letter re: Complaint of Discrimination).

[38]   *Id.*

[39]   R. Doc. 1 ¶¶ 19-21.

complaint.[40]  On December 23, 2019, plaintiff filed a complaint in this Court, raising the same two allegations of retaliation.[41]

On January 20, 2022, defendant filed two motions for summary judgment.[42]  In the first motion, defendant argues that plaintiff did not timely exhaust his administrative remedies on his claim that Williams retaliated against him by not reopening his TFL task book.[43]  In the second motion, defendant asserts that Paulin has failed to show that his allegedly adverse employment actions were causally related to his prior EEO activity.[44] Defendant also contends that, even if plaintiff could show causation, he cannot prove that defendant's legitimate, nondiscriminatory reasons for its actions were pretext for retaliation.[45]  Plaintiff opposes both motions.[46]

The Court considers the parties' arguments below.


## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[40]   *Id.* ¶¶ 22, 26.
[41]   *Id.*
[42]   R. Docs. 41 & 42.
[43]   R. Doc. 41.
[44]   R. Doc. 42 at 1.
[45]   *Id.*
[46]   R. Doc. 47 at 2-3.

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257,

1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution.  *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  (quoting *Celotex*, 477 U.S. at 322)).

## III.   DISCUSSION

### A.   Exhaustion

Title VII requires federal employees to exhaust their administrative remedies with the EEO division of their agency before proceeding to federal court.  *Pancheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006); *see also* 42 U.S.C. § 2000e-16(c).  "As an initial step in the exhaustion process, the employee must 'initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory."  *Yee v. Baldwin-Price*, 325 F. App'x 375, 378 (5th Cir. 2009) (per curiam) (quoting 29 C.F.R. § 1615.105(a)(1)).  That 45-day time limit may be extended in certain cases, including when the federal employee "did not know and reasonably should not have[] known that the discriminatory matter or personnel action occurred."  29 C.F.R. § 1615.105(a)(2).  "Failure to notify the EEO counselor in [a] timely fashion may bar" an employee's Title VII claim.  *Pancheco*, 448 F.3d at 788.

In its first motion for summary judgment, defendant asserts that documents recently produced by plaintiff show that, although Paulin knew as early as June of 2016 that he was assigned the PDMG task book, as opposed to the TFL task book, he did not contact an EEO officer as to this

claim until he filed his amended complaint on March 16, 2018.[47]  Defendant thus argues that plaintiff's second claim should be dismissed as untimely because Paulin's contact with the EEO was well outside of the forty-five day deadline required by the Code of Federal Regulations.[48]

The Court finds that Paulin exhausted his administrative remedies with regard to his task-book claim.   Under 29 C.F.R. § 1614.106(d), a complainant "may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint."  29 C.F.R. § 1614.106(d).  "As the EEOC has interpreted this provision, a new claim is 'like or related to' a pending claim if it 'could have reasonably been expected to grow out of the original complaint during the investigation.'"  *Weber v. Battista*, 494 F.3d 179, 183 (D.C. Cir. 2007) (quoting *Core v. Brownlee*, Appeal No. 01-34550, 2004 WL 189570, at *1 (E.E.O.C. Jan. 23, 2004)).  According to the EEOC and existing caselaw, a claim that is "like or related to" the original claim "is *not* subject to the 45-day counseling requirement."  *Ramirez v. Secretary, U.S. Dep't of Transp.*, 686 F.3d 1239, 1247 n.4 (11th Cir. 2012) (collecting cases).

---

[47]   R. Doc. 41-1 at 5.

[48]   *Id.*

Here, in a letter dated June 8, 2018, FEMA's Office of Equal Rights acknowledged Paulin's request to amend his complaint.[49]  The letter stated that, based on a review of Paulin's "new issue," the agency determined "that it could have reasonably been expected to grow out of the original claim and does not require EEO counseling and/or the filing of another complaint."[50] Further, FEMA's letter informed plaintiff that his second claim would be included as part of the EEO's ongoing investigation of plaintiff's case.[51]

Because plaintiff's task-book claim was determined by the agency to be "like or related to" Paulin's original claim, it was not untimely.  Moreover, given that the agency here made a "specific finding during the administrative process that the administrative complaint was timely," defendant is now prevented from "defend[ing] against a civil complaint by arguing that the administrative complaint was untimely." *Munoz v. Aldridge*, 894 F.2d 1489, 1495 (5th Cir. 1990); *see also Alvarez v. Esper*, No. 16-172, 2018 WL 3717116, at *5 (W.D. Tex. Aug. 3, 2018) (holding that, because "during the administrative process, the Army determined that [plaintiff's] second amendment was timely and thereby accepted the amendment, the agency is now barred from raising the amendment's timeliness issue").  Accordingly,

---

[49]    R. Doc. 41-4 at 1 (Letter re: Complaint of Discrimination).

[50]    *Id.* at 2.

[51]    *Id.*

the Court finds that Paulin did not fail to administratively exhaust his retaliation claim involving Williams's failure to open a TFL task book. The Court therefore denies defendant's motion for summary judgment on exhaustion.

### B.   Liability

Title VII makes it unlawful for an employer to discriminate against an employee who has opposed an employment practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). The antiretaliation provision states, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Id.* In order to state a *prima facie* retaliation claim, a plaintiff must allege that (1) he was engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).

If the plaintiff makes this *prima facie* showing, the burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of*

*Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  Defendant's burden is "only one of production, not persuasion, and involves no credibility assessment." *Abbood v. Tex. Health & Hum. Servs. Comm'n*, 783 F. App'x 459, 463 (5th Cir. 2019) (quoting *McCoy*, 492 F.3d at 557).  If the defendant meets its burden of production, the ultimate burden of persuasion is on the plaintiff to show that "the employer's proffered rationale was pretextual and that engaging in the protected activity was the but-for cause of the adverse employment action (*i.e.*, the employer actually retaliated against the employee)." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir. 1999); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (announcing that "retaliation claims must be proved according to traditional principles of but-for causation").

In its motion for summary judgment on liability, defendant argues that Paulin cannot establish a *prima facie* case of retaliation, and that, even if he has established a *prima facie* case, he cannot establish that defendant's stated reasons for its actions were pretextual.[52]

### 1.   *Paulin's* Prima Facie *Case*

Defendant asserts that Paulin has failed to state a *prima facie* retaliation claim.   Although defendant concedes that Paulin's EEO

---

[52]   R. Doc. 42 at 1.

complaints in 2009, 2012, and 2013 were protected activities, and that the Court previously denied summary judgment as to whether Paulin suffered from an adverse employment actions,[53] defendant argues that Paulin has failed to establish a causal link between his protected activities and the adverse employment actions he alleges.[54]  Specifically, defendant notes that the several-year gap between plaintiff's 2013 EEO complaint and the alleged adverse employment actions that occurred in 2017 is insufficient to show a causal link.[55]

To establish the third prong of a *prima facie* case of retaliation, a plaintiff must present evidence of a causal connection between his protected activities and the alleged adverse employment actions he suffered.  Whether or not a plaintiff has met this causation burden is a "highly fact specific" inquiry.  *Nowlin v. Resolution Tr. Corp.*, 33 F.3d 498, 508 (5th Cir. 1994).  At the *prima facie* stage, plaintiff's burden of establishing a causal link is less stringent than the causation inquiry at the pretext stage, which requires the application of the but-for causation standard.  *See Williams v. BRFHH*

---

[53]   In its current summary-judgment motion, defendant states that, "[f]or the sake of completeness and preservation of the issue," it adopts its previous arguments that plaintiff did not suffer any adverse employment actions.  R. Doc. 42 at 7.

[54]   R. Doc. 42-1 at 7-8.

[55]   *Id.*

*Shreveport, L.L.C.*, 801 F. App'x 921, 925 (5th Cir. 2020) (per curiam) ("[W]e have repeatedly held that the requirement of showing but-for causation applies in the final, pretext stage, rather than the prima facie stage."). Nevertheless, the plaintiff "must produce *some* evidence of a causal link." *Everett v. Cent. Miss., Inc. Head Start Program*, 444 F. App'x 38, 46 (5th Cir. 2011) (per curiam).  In evaluating whether plaintiff has produced some evidence of causation, "the focus must be on the final decisionmaker; that is, the plaintiff must present evidence that the final decisionmaker with respect to the adverse employment action was aware of the plaintiff's protected conduct." *Id.*

One way that a plaintiff can satisfy the causal-connection element is by relying on the "close timing between an employee's protected activity and an adverse action against him." *Feist v. La. Dep't of Just.*, 730 F.3d 450, 454 (5th Cir. 2013).  The "temporal proximity" between the protected act and the adverse employment action must be "very close" to establish causation by timing alone. *See Clark Cnty. Sch. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

But, absent close temporal proximity, a plaintiff can "still show a causal connection if there is 'other evidence of retaliation.'" *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 348 (5th Cir. 2016) (per curiam) (quoting *Feist*, 730 F.3d at 454); *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995) ("The timing of the adverse employment action can be significant, although not necessarily determinative, factor."). The Fifth Circuit has noted that "other evidence of retaliation" may include "an employment record that does not support [the adverse employment action], or an employer's departure from typical policies and procedures." *Feist*, 730 F.3d at 454-55 (citing *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1024 (5th Cir. 2011)).

Paulin raises two arguments in support of his assertion of a causal link. First, he contends that although his final EEO complaint was filed in 2013, he "pressed that claim to administrative litigation within the EEOC and actively litigated the matter until the parties settled around June 2017."[56] He thus argues that he has established temporal proximity because he was assigned a PDMG task book "on the eve of the parties' settlement," which was a few months before the Hurricane Harvey deployment.[57] In support of this

---

[56]   R. Doc. 47 at 15.
[57]   *Id.* at 8.

contention, Paulin attaches to his opposition several emails between plaintiff's then-counsel and FEMA, which reference the signing of the settlement agreement.[58]  The emails are dated from the end of June of 2017.[59] Plaintiff concedes that, although these emails would have been responsive to one of defendant's discovery requests, they were not produced during discovery and were allegedly "only found after defendant raised the issue of insufficient temporal proximity in its motion for summary judgment."[60]

The Court finds several problems with plaintiff's argument that the relevant date for determining temporal proximity is 2017, when he settled his complaint.  First, the evidence that plaintiff relies on for this assertion was not timely produced.  Despite that the 2017 emails discussing his settlement were plainly relevant to defendant's discovery request,[61] plaintiff did not produce them until well after the July 6, 2021 close of discovery.[62] Federal Rule of Civil Procedure 37 provides that, "[i]f a party fails to provide

---

[58]   R. Doc. 47-17 at 1-5 (Signed Settlement Agreement Emails).

[59]   *Id.*

[60]   R. Doc. 47-1 at 11 n.16.

[61]   *See* R. Doc. 41-8 at 31 (RFP No. 12) ("Please produce a copy of each and every document which refers, reflects or relates to each and every legal proceeding you have been involved in, whether federal or state, whether criminal, civil, or administrative.").

[62]   *Id.*; *see also* R. Docs. 52 at 3 n.10 & R. Doc. 21.

information or identify a witness as required by Rule 26(a) or (e),[63] the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."   Fed. R. Civ. P. 37(c)(1).   In determining whether the exclusion of evidence under Rule 37 is appropriate, the Fifth Circuit has instructed courts to consider four factors: "(1) the explanation for the failure to [comply with the scheduling order]; (2) the importance of the [evidence]; (3) the potential prejudice in allowing the [evidence]; and (4) the availability of a continuance to cure such prejudice."  *O'Neal v. Cazes*, 257 F. App'x 710, 716 (5th Cir. 2007) (per curiam) (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990)).

The Court concludes that the above factors weigh in favor of excluding plaintiff's late-produced documents.  Plaintiff offers no justification for his failure to timely disclose these documents aside from his assertion that the "particular documents w[ere] only found after defendant raised the issue of

---

[63]   The applicable section here is Rule 26(e) which requires that a party who has responded to "an interrogatory, request for production, or request for admission . . . supplement or correct its disclosure or response. . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e).

insufficient temporal proximity in its summary-judgment motion."[64]   The Court finds that this lack of explanation weighs heavily against the consideration of the documents.  *See Terrance v. Pointe Coupee Par. Police Jury*, 177 F. App'x 457, 459 (5th Cir. 2006) (finding no abuse of discretion in the exclusion of testimony when plaintiff failed to provide a reason for the late disclosure).   Given that causation and temporal proximity are foundational to a plaintiff's *prima facie* case of retaliation, the Court finds plaintiff's explanation to be especially unpersuasive.  *See Patterson v. Hous. Indep. Sch. Dist.*, 570 F. App'x 367, 370 (5th Cir. 2014) (affirming a district court's decision to strike a Title VII plaintiff's documents that were produced for the first time in response to defendant's motion for summary judgment, despite "years of litigation, including [plaintiff's] charge to the EEOC," during which she "never mentioned that she had such an email").

Moreover, plaintiff does not contend that the late emails are important evidence.  And "given the advanced stage of the litigation," permitting the admission of such evidence would result in prejudice to defendant.  *See CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009).  Finally, this case has been pending for several years, and the Court has previously granted

---

[64]   R. Doc. 47-1 at 11 n.16.

the parties' request for a continuance.[65]   Accordingly, in deciding on defendant's summary judgment motion, the Court will not consider the late-produced emails that discuss plaintiff's 2017 settlement.

Even if the Court were to consider the settlement emails, plaintiff does not assert, and this Court does not find, that the finalization of plaintiff's settlement agreement is a protected activity under the participation clause of Title VII's anti-retaliation provision.  *See Aguillard v. La. Coll.*, 824 F. App'x 248, 251 (5th Cir. 2020) (per curiam) (noting that Title VII prohibits retaliation against employees who file "charges with the EEOC, testify before the EEOC, assist the EEOC, or participate in EEOC investigations" (citing 42 U.S.C. § 2000e-3(a)); *cf. Schiff v. City & Cnty. of San Francisco*, 816 F. Supp. 2d 798, 823 (N.D. Cal. 2011), *aff'd*, 528 F. App'x 743 (9th Cir. 2013) ("[Plaintiff] suggests that it was the settlement of [plaintiff's prior lawsuit] that precipitated the retaliatory actions, but the settlement was not a protected activity, and he does not explain how the settlement of a lawsuit would induce [defendant] to retaliate against him.").

In cases similar to this one, the Fifth Circuit has used the date that the plaintiff initially filed an EEOC complaint, not the date on which the parties settled the complaint, as the relevant date for determining temporal

---

[65]     R. Doc. 29.

proximity.  *See Devere v. Forfeiture Support Assocs., L.L.C.*, 613 F. App'x 297, 301 (5th Cir. 2015) (per curiam) (noting that when plaintiff filed her EEOC complaint in December 2009, and reached a settlement with ICE in December 2010, plaintiff had failed to establish temporal proximity between her "filing of the EEOC complaint in December 2009 and her termination in May 2011").  And the Supreme Court, in *Clark County School District v. Breeden*, rejected a plaintiff's attempt to establish temporal proximity between the EEOC's right-to-sue letter and the adverse employment action, reasoning that, if the employer knew about the right-to-sue letter, "one must also presume that she . . . knew *almost two years earlier* about the protected action (filing of the EEOC complaint.)"  532 U.S. at 273-74.  Accordingly, the Court finds that the relevant period for determining temporal proximity in this case is from 2013, when Williams learned about the complaint, until 2017, when the alleged adverse employment actions occurred.

Having established the relevant dates for calculating temporal proximity, the Court now addresses whether plaintiff has shown a close temporal proximity between Williams's knowledge that Paulin filed an EEO complaint against him and the alleged adverse employment actions.  Paulin filed his three previous EEO charges in 2009, 2012, and 2013.  Paulin represents that, according to his "official DTS report," Williams classified

Paulin as a PDMG trainee without a TFL task book on April 12, 2017.[66]  And Paulin was not selected for the Hurricane Harvey deployment in August or September of 2017.[67]   Based on this timeline, Paulin's alleged adverse employment actions occurred several years after he filed his final EEO complaint in 2013.  This temporal proximity, standing alone, does not permit an inference of causation, and to the contrary, "undermines any causal connection between those two events."  *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002); *Mayberry*, 55 F.3d at 1092 (holding that "there is nothing inherently 'suspicious' about a 13-day suspension that occurs several years after the protected activity begins," and instead noting that such a lapse in time may be "evidence *against* retaliation"); *Allard v. Holder*, 494 F. App'x 428, 432 (5th Cir. 2012) (per curiam) (noting that a delay of over two years "is indicative of a lack of the required causal nexus between the protected activity and adverse employment action at issue").

Second, plaintiff asserts that, even if the Court rejects his argument about temporal proximity, he has submitted sufficient circumstantial evidence to show causation.[68]  In addition to temporal proximity, the Fifth Circuit has also noted that a court may consider the following "indicia of

---

[66]   R. Doc. 47 at 12.
[67]   R. Doc. 47-4 at 36 (Williams Deposition at 164:16-20).
[68]   R. Doc. 47 at 16-17.

causation:" (1) the employee's past disciplinary record, and (2) whether the employer followed its typical policy and procedures when it undertook an adverse employment action against the plaintiff. *Schroeder*, 664 F.3d at 1024. The Court is unaware of any Fifth Circuit cases in which a plaintiff alleging retaliation successfully established causation when there was over a four-year gap between the last filed complaint and the alleged retaliation, even when the plaintiff relied on circumstantial evidence of a causal link. Instead, the Fifth Circuit has held that plaintiffs have not established causation with temporal gaps far shorter than four years, even when the plaintiffs did not rely only on temporal proximity. *See, e.g.*, *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007) (finding that a two-year gap, combined with plaintiff's assertion that he was treated differently from other appraisers in his office, was insufficient to present "circumstantial evidence sufficient to establish causation"); *Vargas v. McHugh*, 630 F. App'x 213, 217 (5th Cir. 2015) (per curiam) (finding that a fifteen-month gap combined with plaintiff's attorney's closing argument at an EEOC hearing was insufficient to establish causation).

And in cases when the Fifth Circuit has found causation with a temporal gap of slightly over a year, the plaintiff presented strong circumstantial evidence of retaliation. For example, in *Shirley v. Chrysler*

*First, Inc.*, the Fifth Circuit found that plaintiff had established a causal nexus between her EEOC complaint and her subsequent termination fourteen months later.  970 F.2d 39, 43 (5th Cir. 1992).  In establishing causation, the plaintiff in *Shirley*, was able to overcome the temporal gap by presenting evidence that her employer mentioned her EEOC complaint "at least twice a week," "harassed [her] to death" about it, and that, although she had worked for her employer for nine years without any complaints, "suddenly, after [she] filed her EEOC complaint, problems with her work surfaced." *Id.*

Here, unlike in *Shirley*, there is no suggestion that Williams ever commented on Paulin's complaints, or that they otherwise played any role in his decision to assign Paulin the PDMG task book.  Albert Walters, another supervisor who helped Williams classify employees under the new model, testified that he and Williams had "no special discussion about Mr. Paulin," and instead asserted that they had general discussions about all the employees and "moved everybody based on what their prior titles were."[69] Further, plaintiff has failed to discuss his disciplinary record aside from his testimony that he had "a letter of warning."[70]  He also has not pointed to any

---

[69]     R. Doc. 42-6 at 4 (Walters Deposition at 81:22-25).

[70]     R. Doc. 47-7 at 4 (Paulin Deposition at 56:15-25).

evidence that FEMA deviated from its typical policies and procedures when assigning Paulin a PDMG task book.  Instead, the record states that Williams was tasked with assigning employees new FQS titles that best correlated with their past position titles and supervisory experiences.[71]   And Williams testified that he followed this guidance in assigning Paulin the PDMG trainee title, explaining that he "thought it was equivalent to [Paulin's] previous experiences."[72]   While Paulin may disagree with Williams's ultimate judgment and whether he accurately accounted for Paulin's previous supervisory experience, he does not point to any evidence that Williams's decision-making process deviated from FEMA's typical policy or procedure for assigning new FQS titles to its employees.  *See Paul*, 666 F. App'x at 348 (declining to find causation when plaintiff engaged in a protected activity in 2009 and was terminated in 2014, and "entirely failed to discuss her employment record," and did "not point to any deviation from [defendant's] typical policies and procedures"); *see also McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 459 (5th Cir. 2019) (noting

---

[71]    *See* R. Doc. 42-5 at 6 (Williams Deposition at 32:6-11) (testifying that he was told to look at "the individual's current and in-past position titles and to correlate them to the task of the new positions").

[72]    *Id.* at 13 (Williams Deposition at 162:19-25).

that "a mere . . . disagreement about how to apply company policy" does not establish causation).

Instead of relying on the factors that courts generally consider when assessing causation, Paulin contends that the "overall context of this case" suggests causation, notably that Williams was aware that Paulin had been filing EEO complaints against FEMA and Williams for over eight years.[73] Plaintiff further argues that an inference of causation can be drawn from Williams's lack of a credible explanation as to why he did not open a TFL task book for Paulin in light of Paulin's supervisory experiences and his old-model TFL task book.[74]

The Court finds that Paulin's alleged "circumstantial evidence" of retaliation is insufficient to establish causation. First, Williams's awareness of Paulin's repeated EEO complaints over several years does not provide circumstantial evidence of Williams's retaliatory motive. To the contrary, any inference of causation is undercut by the apparent fact that, although Williams was aware that Paulin had repeatedly brought EEO complaints against him over the past eight years, he waited until 2017 to take allegedly adverse employment actions, despite being Paulin's supervisor the entire

---

[73]   *Id.*
[74]   *Id.*

time.   In addition to Paulin's lengthy tenure under Williams, there is evidence that, in 2015, Williams permitted plaintiff to serve in the acting role of a PAC Lead on one of Williams's units, thus giving plaintiff the opportunity to expand his supervisory experience.[75]

In similar cases when a plaintiff has a history of engaging in protected activity, courts have declined to find a causal connection between those activities and an adverse employment action that occurred years later.  *See, e.g.*, *Brown v. Bd. of Comm'rs*, No. 10-4564, 2013 WL 4548462, at *5 (E.D. La. Aug. 27, 2013), *aff'd*, 567 F. App'x 263 (5th Cir. 2014) ("It is 'unreasonable to presume' that [plaintiff] was 'suddenly' terminated in 2011 for making the same complaints he had been making since 2006."); *Rodriguez v. Tex. Dep't of Crim. Just.*, No. 06-820, 2007 WL 2670054, at *5 (S.D. Tex. Sept. 7, 2007) (noting that plaintiff's "lengthy tenure" of engaging in protected activities "negates any inference of employer hostility or retaliatory motive"); *Dronet v. Lafarge Corp.*, No. 00-2656, 2001 WL 699384, at *4 (E.D. La. June 20, 2001) ("Because [plaintiff] had lodged his informal complaints for several years without adverse consequences, the Court finds that he has failed to establish a causal connection between his complaints and his termination.").  Accordingly, the Court does not find that

---

[75]   R. Doc. 47-4 at 15 (Williams Deposition at 95:1-22).

plaintiff's long-asserted complaints against Williams amount to circumstantial evidence of retaliation.

The Court similarly finds that plaintiff's assertions regarding his past supervisory experience and an open TFL task book also do not rise to the level of "other evidence of retaliation" that might establish a causal connection. Williams testified that, because Paulin's former title of PAC Lead was eliminated under the new model, and thus did not "automatically equate" to a new FQS title, "there [was] a level of discretion that would have . . . been part of [his] decision-making process," which "had nothing to do with [Paulin's] prior EEO complaints."[76] Although Williams recognized that Paulin had some supervisory experience as a PAC Lead, he explained that he felt a PDMG task book was more appropriate for Paulin because he had "never worked as a task force [lead] at [any] time during his . . . past deployments,"[77] and Williams did not feel it was "realistic" to give him a TFL task book "for a position he [had] never performed in."[78]

---

[76]   R. Doc. 47-4 at 32 (Williams Deposition at 155:6-14).

[77]   Although Paulin asserts that Williams assigned him to the incorrect title because he had a TFL task book open under the old model, he does not dispute Williams's assertion that he had never deployed as a TFL trainee. *See* R. Doc. 47-8 at 3 (Letter from Paulin to Williams, Dec. 16, 2015).

[78]   R. Doc. 47-6 at 3 (Williams Affidavit).

It is well established that an employee's "mere disagreement with [his employer]'s assessment of his performance" or qualifications is insufficient to establish causation, even if the employer relies on "an incorrect belief." *Moore v. Centralized Mgmt. Servs., L.L.C.*, 843 F. App'x 575, 579 (5th Cir. 2021) (per curiam) (quoting *Little v. Rep. Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). Thus, even though Paulin asserts that Williams assigned him the incorrect title because he had a TFL task book open under the old model, the "existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little*, 924 F.2d at 97.

In sum, the Court finds that Paulin has failed to establish a causal connection between his last filed complaint in 2013 and the alleged adverse employment actions in 2017. Paulin has therefore not discharged his burden of putting forth a *prima facie* case of retaliation. Accordingly, defendant is entitled to summary judgment on plaintiff's two retaliation claims.

2.    *Legitimate, Nondiscriminatory Reasons*

Even if Paulin had made out a *prima facie* case, the Court finds that defendant has provided legitimate, nondiscriminatory reasons both for plaintiff's new FQS position and his non-selection for the Hurricane Harvey

deployment.  With respect to the task book, the Court finds that defendant has produced a legitimate, nondiscriminatory reason for Williams's refusal to designate Paulin as a TFL trainee: that Paulin lacked the requisite experience and training.   Specifically, defendant asserts that Paulin's "previous experience was more correlated to a PDMG[,] and he lacked the supervision and oversight of staffing experience that individuals assigned TFL had."[79]   To support this assertion, defendant points to Williams's testimony that he assigned Paulin a PDMG task book under the new model because "the previous position that [Paulin] held as [a] PA crew leader or PAC  crew leader w[ere] pretty consistent with the role of the program delivery manager."[80]   Williams further stated that employees who had held positions equivalent to Paulin's under the old model were similarly assigned as "[p]rogram delivery managers or site inspectors" under the new model.[81]   Defendant additionally points to Walters, who testified that employees who

---

[79]    R. Doc. 42-1 at 8-9.

[80]    R. Doc. 42-5 at 13 (Williams Deposition at 162:19-25).

[81]    *Id.* at 14 (Williams Deposition at 163:18-22).

were TFLs under the old model became TFLs under the new model, "and the other folks became PDMGs."[82]

And with respect to the Hurricane Harvey deployment, defendant points to the deposition testimony of Williams, who stated that Paulin was not selected for the deployment because (1) "he was not one of the PDTFL trainee/candidates or qualified staff under [the] organizational structure," and (2) "he was already deployed to the surge capacity force."[83]   It is undisputed both that Paulin lacked the necessary TFL task book to be considered for the Hurricane Harvey deployment, and that FEMA employees cannot be deployed to more than one event at a time.[84]

3.   *Pretext*

Because defendant has produced legitimate, nondiscriminatory reasons for Paulin's designation under the new delivery model and non-deployment for Hurricane Harvey, plaintiff must show that there is a genuine issue of material fact that defendant's reasons are pretextual.  At the pretext stage, Paulin has the burden of showing that "the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred but for the

---

[82]   R. Doc. 42-6 at 3 (Walters Deposition at 76:9-20).
[83]   R. Doc. 42-5 at 15-16 (Williams Deposition at 164:21-165:8).
[84]   R. Doc. 47-1 at 19-20.

employer's retaliatory motive." *Garcia v. Prof. Contract Servs., Inc.*, 938 F.3d 236, 244 (5th Cir. 2019) (citing *Nassar*, 570 U.S. at 360). A plaintiff can establish this "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence, [meaning that] it is not the real reason for the adverse employment action." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017).

In establishing pretext, a plaintiff "must do more than just dispute the underlying facts and argue that [the employer] made the wrong decision in order to survive summary judgment." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) ("Merely disputing [the employer's] assessment of [the employee's] performance will not create an issue of fact."). Further, a plaintiff's "general subjective belief" that he suffered an adverse employment action as "the result of retaliation is insufficient to establish pretext." *Dronet*, 2001 WL 699384, at *6.

In addition to relying on his *prima facie* evidence of causation, Paulin raises two additional arguments in asserting that defendant's reason for not opening Paulin a TFL task book is pretextual,[85] neither of which establishes a genuine dispute of material fact regarding pretext. First, Paulin points to

---

[85]     R. Doc. 47 at 17.

the testimony of his former supervisor, Jim Ali, who testified that, based on his previous supervision of Paulin, he "would have given [Paulin] an opportunity to try to complete" the TFL task book, noting that, "to [him], [Paulin] had demonstrated [that] he had skills above a PDMG."[86]  Ali further testified that he "disagreed" with Williams's assessment that Paulin's old model title—PAC Lead—was most equivalent to the PDMG position under the new model.[87]  Paulin contends that Ali's testimony calls into question the veracity of Williams's explanation that he assigned Paulin a PDMG task book because he believed it was consistent with Paulin's PAC Lead role experience.[88]

The Court finds Ali's testimony deficient for a number of reasons.  As an initial matter, there is no evidence that Ali was in a position to make an informed determination about which title Paulin was best qualified for based on the relevant factors.  Unlike Williams, who at the time was an Infrastructure Branch Director, the "highest position in the FQS title," and who exercised supervision "over many employees,"[89] Ali is a Public

---

[86]   R. Doc. 47-5 at 20-21 (Ali Deposition at 69:17-70:16).

[87]   *Id.*

[88]   R. Doc. 47-1 at 16.

[89]   R. Doc. 42-5 at 5 (Williams Deposition at 15:19-23); *id.* at 6 (Williams Deposition at 30:10-14).  According to the organizational chart of the Louisiana Recovery Office attached to plaintiff's opposition, Williams appears to have supervised over 100 employees.  R. Doc. 47-11 at 1.

Assistance Group Supervisor ("PAGS"), a title that has "five to six TFL[s] reporting to [it]."[90]  And, unlike Williams, there is no evidence that Ali was asked to assign a large number of employees new titles under the FQS model, or that he received guidance from FEMA management about what factors to consider in making such assignments.  Ali acknowledges this point, admitting that he did not know "the pool of candidates" that were being considered for the TFL position.[91]  Finally, unlike Williams who has supervised Paulin throughout his time at FEMA, Ali last supervised Paulin, prior to the alleged constructive demotion, during Paulin's 2008 and 2009 Gustav and Ike deployments.[92]  The Court thus finds that Ali's subjective opinion that Williams incorrectly assigned Paulin a PDMG task book is insufficient to establish that Williams's non-retaliatory justification is pretextual.

The Court notes that, not only does Ali's lack of information and perspective on these issues undermine the persuasiveness of his opinion testimony, but it also calls into question the opinion's admissibility.

---

[90]   R. Doc. 47-5 at 9 (Ali Deposition at 45:4-13); *id.* at 7 (Ali Deposition at 43:1-4).

[91]   *See id.* at 14 (Ali Deposition at 53:12-24) (testifying that whether or not he considered Harrison qualified for the TFL position "depend[ed] on the pool of candidates" and "who she was competing against").

[92]   R. Doc. 47-7 at 4 (Paulin Deposition at 55:23-56:15); R. Doc. 47-5 at 2-3 (Ali Deposition at 35:13-36:8).

Specifically, Ali's testimony is not rationally based on his own first-hand observations, or otherwise meets the requirements of Federal Rule of Evidence 701 on lay opinion testimony. Rule 701 provides that lay witnesses are permitted to provide opinion testimony if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

In Title VII cases, the Fifth Circuit has "permitted lay witnesses to express opinions about the motivation or intent of a particular person if the witness has an adequate opportunity to observe the underlying circumstances." *Hansard v. Pepsi-Cola Met. Bottling Co., Inc.*, 865 F.2d 1461, 1466 (5th Cir. 1989). In the summary-judgment context, the Fifth Circuit has affirmed a district court's decision not to admit an affidavit authored by another employee who speculated "as to why the plaintiff was fired," when the affiant was not "involved in any way in the decision to terminate the plaintiff." *Vance v. N. Panola Sch. Dist.*, 189 F.3d 470, 470 (5th Cir. 1999) (per curiam). Given that Ali was not "involved in any way" in the reclassification of titles under the new FQS model, and had not supervised Paulin for many years, his opinion about the correctness of Williams's assessment of Paulin's title does not appear to be based on his

37

own first-hand observations.  Ali's lack of firsthand knowledge renders his lay opinion inadmissible.

But even assuming that Ali's lay opinion testimony is admissible, it would still fail to create an issue of material fact as to pretext.  The relevant question in showing pretext is not whether the defendant "made the *correct evaluation*" in assigning Paulin a PDMG task book under the new model, "but whether the decision was made with discriminatory motive." *Ward v. Gray Television Grp., Inc.*, 787 F. App'x 850, 851 (5th Cir. 2019) (per curiam) (internal quotations omitted).  Even if Ali's testimony could suggest that Williams was incorrect in his decision that Paulin's qualifications corresponded with the PDMG task book, his testimony does nothing to suggest that Williams made the assignment with a retaliatory motive. *See Abbood*, 783 F. App'x at 463-64 ("Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones." (quoting *LeMaire*, 480 F.3d at 388-89)).  Thus, Ali's opinion testimony, even if admissible, is beside the point for purposes of establishing pretext.

Next, Paulin argues that defendant's rationale that he lacked sufficient supervisory experience for a TFL task book is unworthy of credence because Williams selected another employee, Jade Harrison, who had less

supervisory experience than Paulin.[93]   *See Caldwell*, 850 F.3d at 242 (explaining that a plaintiff can establish pretext through evidence of disparate treatment).   Paulin has presented evidence that, according to Harrison's FEMA DTS report, under the old model, she had never been assigned to a deployment in a supervisory position.[94]   Paulin also attaches his FEMA DTS report, which shows that, under the old model, he deployed several times as a PAC Lead,[95] which several people, including Williams and Harrison, testified is a supervisory position.[96]   Paulin also points to testimony from Ali, who was also Harrison's former supervisor in 2012 and 2013,[97] who stated that because of Paulin's "construction background and work on structural losses," he would have expected that Paulin "might have been" more qualified than Harrison for the TFL position.[98]  Ali also testified that it was "just [his] opinion at the time" that Harrison "needed a little more experience" and "some more training" for the TFL role.[99]

---

[93]   R. Doc. 47 at 18-19.

[94]   R. Doc. 47-4 at 21 (Williams Deposition at 108:13-25); R. Doc. 47-13 at 11-15 (Harrison DTS Report).

[95]   *See, e.g.*, R. Doc. 47-14 at 36-37 (Paulin DTS Report).

[96]   R. Doc. 47-4 at 15 (Williams Deposition at 95:1-25); R. Doc. 47-12 at 3 (Harrison Deposition at 47:24-48:16).

[97]   R. Doc. 47-5 at 2, 12-13 (Ali Deposition at 35:13-18, 51:21-52:2).

[98]   *Id.* at 16-17 (Ali Deposition at 55:23-56:6).

[99]   *Id.* at 14 (Ali Deposition at 53:12-24).

In response, defendant argues that it is entitled to summary judgment because any evidence that plaintiff has submitted about Harrison is irrelevant given that she was not similarly situated to Paulin. Defendant asserts that Paulin and Harrison were not similarly situated because she was "more qualified" and had a "different title[] and more supervisory experience than Plaintiff."[100] Defendant points to Harrison's deposition testimony that, from 2014 to 2017, her "everyday working FQS title at LIRO" was a TFL.[101] Harrison also testified that, during that period, she had "a team of project specialists that [she] was managing."[102] Specifically, Harrison explained that on a day-to-day basis she was "doing supervisory work," such as "reviewing . . . project worksheets," "signing off on any training requests," completing "performance evaluations," "distributing workload," and in cases when there was an audit, she would "identify who from [her] team would work on it."[103] And prior to 2014 when she was assigned the TFL title, Harrison testified that she had experience in "an acting TFL role."[104]   Harrison's testimony

---

[100]   R. Doc. 42-1 at 11.

[101]   R. Doc. 42-8 at 5 (Harrison Deposition at 25:14-20).

[102]   *Id.* at 9 (Harrison Deposition at 42:4-17).

[103]   *Id.* (Harrison Deposition at 42:15-24).

[104]   *Id.* (Harrison Deposition at 26:9-15).

about her supervisory role as a TFL is corroborated by her supervisor, Williams.[105]

Plaintiff concedes that Harrison's deposition testimony about her old model title is in direct conflict with her DTS report, which showed that Harrison had no employment history in the TFL position prior to her reclassification under the new model in 2016.[106] Nevertheless, Paulin contends that defendant's evidence "at best" suggests that material facts regarding pretext remain in dispute.[107]

As an initial matter, the Court finds that Ali's opinion testimony that Paulin "might have been" more qualified than Harrison for the TFL position because of his background in construction and structural losses, is irrelevant.[108] Ali does not suggest that Paulin's work in construction and structural losses was supervisory in nature or that it was tied to his FQS title. Indeed, Williams was asked to assign new FQS titles that he believed best corresponded with each employee's prior title and supervisory experience. Accordingly, Ali's opinion that he believed Paulin might be more qualified based on factors that Williams was not asked to consider, does nothing to

---

[105]   R. Doc. 47-4 at 21 (Williams Deposition at 108:7-12).
[106]   R. Doc. 47-1 at 22.
[107]   R. Doc. 47 at 19.
[108]   R. Doc. 47-5 at 14 (Ali Deposition at 53:12-24).

further plaintiff's contention that Williams treated him less favorably than other employees. Moreover, Ali's testimony that it was "just [his] opinion" that based on his supervision of Harrison in 2012-2013 that she could have used "a little more" experience, indicates that Ali was making a judgment call in his evaluation of Harrison's experience. Disagreements about the exercise of an employer's judgment do not rise to the level of establishing pretext. Further, Harrison had another year to gain that "little more" experience by the time she was assigned a TFL task book in 2014. Importantly, Ali does not testify that Harrison was clearly unqualified for the TFL position, or that there was a substantial gap in her and Paulin's credentials. *See Price v. Fed. Exp. Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) (per curiam) ("In order to establish pretext by showing the losing candidate has superior qualifications, the losing candidate's qualifications must 'leap from the record and cry out to all who would listen that he was vastly—or even clearly—more qualified for the subject job.'" (quoting *Odom v. Frank*, 3 F.3d 839, 845-46 (5th Cir. 1993))).

Further, after examining the record, the Court finds that Paulin has failed to establish pretext through disparate treatment because Harrison was not a "nearly identical, similarly situated individual." *See Harris v. Miss. Transp. Comm'n*, 329 F. App'x 550, 556-57 (5th Cir. 2009) (per curiam).

42

Paulin relies exclusively on Harrison's DTS report to argue that she was not a TFL under the old model, and thus was similarly situated, or even less qualified, than Paulin.  But Williams testified that in deciding how to assign new FQS titles to the employees he supervised, he relied on "organizational charts" and the "previous positions" that he knew employees held in the Louisiana Recovery Office.[109]  He affirmatively stated that he did not rely on any person's DTS report.[110]  In fact, in his deposition Williams testified that he had never seen Harrison's DTS report until it was shown to him as an exhibit during his deposition.[111]  Thus, plaintiff has not established that Williams made his decision in knowing disregard of this document.  Accordingly, Harrison's DTS report cannot be the basis for Paulin's allegation of intentional disparate treatment.

Defendant also points to deposition testimony from FEMA employees who dealt with the DTS report and testified that it was unreliable.  Williams testified that Harrison's DTS report is "inaccurate," and that it is contradicted by LIRO's "organizational charts prior to 2016."[112]  Similarly, in looking at her DTS report, Harrison testified that she was not sure why her

---

[109]    R. Doc. 42-5 at 14 (Williams Deposition at 163:1-18).

[110]    *Id.* at 14 (Williams Deposition at 163:1-12).

[111]    *Id.* at 7 (Williams Deposition at 103:9-12).

[112]    R. Doc. 47-4 at 22-23 (Williams Deposition at 109:1-110:16).

TFL title was not included, but emphasized that she was hired in 2014 as a TFL, and suggested that her DTS tracker may have reflected her hired-in title.[113]  And upon examination, the Court found instances where Harrison's DTS tracker directly contradicts undisputed facts in the record.  For example, both parties agree that Harrison was assigned a new model FQS position of TFL on June 29, 2016.[114]  Yet her DTS report has her serving as a "PA Old Public Assistance Project Specialist" and "Old Public Assistance Group Supervisor" at various points well into 2017, in addition to serving in her "PA Program Delivery Task Force Leader" role.[115]

Plaintiff's reliance on Harrison's DTS report to demonstrate that she was not a TFL does not establish pretext given its inaccuracy, and because plaintiff does not contest Harrison's detailed testimony that she performed TFL supervisory tasks on a day-to-day basis.  The Court finds that, on this basis alone, Paulin and Harrison were not similarly situated.  Employees are considered similarly situated when they hold "*the same job or responsibilities*, share the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."  *Garcia*, 938 F.3d at 244 (emphasis added) (quoting *Lee v. Ks.*

---

[113]  R. Doc. 42-8 at 8 (Harrison Deposition at 41:5-13).

[114]  R. Doc. 47-1 ¶ 43.

[115]  *See, e.g.*, 47-13 at 12-14 (Harrison's DTS tracker).

*City So. Rwy. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009)).  Given that Paulin never asserts that he had supervision over a team of employees outside of his sporadic deployments as an acting PAC Lead, he cannot establish that he had the same day-to-day supervisory responsibilities that Harrison testified she had under the old model.  Accordingly, Paulin has failed to establish evidence of disparate treatment, because he and Harrison were not "similarly situated" when Williams assigned Harrison, but not Paulin, a TFL task book under the new model.

Ultimately, this case comes down to a judgment call made by plaintiff's supervisor as to what position to assign plaintiff after his former title was eliminated.  And although plaintiff may disagree with Williams's assessment, it is not the Court's role when conducting a pretext analysis "to engage in second-guessing of an employer's business decision." *See LeMaire*, 480 F.3d at 391.  Moreover, plaintiff has failed to carry his burden of persuasion of showing that defendant's legitimate, nondiscriminatory reason was a pretext for retaliation.  *See Chaney*, 179 F.3d at 167.  Notably, Paulin engaged in protected activities dating as far back as 2009 and does not allege that he suffered an adverse employment action until 2017.  Such a large time gap, combined with Paulin's lengthy tenure under Williams's supervision, negates any inference of causation.  Paulin also has not pointed to any

evidence that defendant departed from its standard policy in classifying plaintiff under the new model. And finally, although Williams reclassified many employees under the new model, plaintiff has provided only one alleged comparator, Harrison, who was not similarly situated to him. *Contra Wallace v. Seton Family of Hosps.*, 777 F. App'x 83, 93 (5th Cir. 2019) (finding sufficient evidence of pretext when plaintiff's supervisor threatened to "get [plaintiff] in trouble;" plaintiff's employer provided shifting explanations for firing plaintiff; there was close temporal proximity between plaintiff's protected activity and termination; and plaintiff presented evidence that the employer disciplined plaintiff differently than other similarly situated employees); *Anderson v. La. Dep't of Trans.*, 836 F. App'x 304, 308 (5th Cir. 2020) (finding pretext when less than two months passed between plaintiff's protected activity and her alleged constructive discharge; similarly situated employees who engaged in similar behavior were not reprimanded; and evidence indicated that defendant failed to follow its own disciplinary policy when disciplining plaintiff).

The Court thus finds that Paulin has not produced evidence from which a reasonable factfinder could conclude that he would have been given the TFL task book but for his decision to file EEO complaints. The Court grants defendant's motion for summary judgment on Paulin's TFL task-book claim.

Plaintiff has also failed to submit evidence creating a genuine issue of fact on pretext as to his second claim of retaliation concerning his non-deployment for Hurricane Harvey. Defendant argues that, even if plaintiff had the requisite TFL task book, he would not have been considered for the Harvey deployment because he was already deployed on surge capacity at the time Williams selected employees for the deployment, and FEMA employees cannot be deployed to more than one event at a time.[116] The record confirms that Paulin was already deployed at the time of Williams's decision, because two weeks after Williams announced the employees selected for the Hurricane Harvey deployment,[117] Paulin emailed Walters that he had "demobilized from Surge activity."[118] Additionally, Williams explained his process for selecting employees for the Hurricane Harvey deployment as follows:

> A. . . . So, again, the process: Who is available, who recently deployed or is already deployed, and then for that particular deployment, we look at who had not deployed within the last two years and—and was available. And [for Hurricane Harvey] it ended up being Malbrough, Jade [Harrison], and Delwanda [Snyder].
>
> Q. Okay. Would you agree with me that, because at the time Mr. Paulin did not have an open task book for a new delivery model TFL position, he was not—he could not have been considered for

---

[116]   R. Doc. 42-1 at 9-10.

[117]   Williams made his deployment selection on or around September 26, 2017. R. Doc. 41-4 at 1 (Letter re: Complaint of Discrimination).

[118]   R. Doc. 42-7 at 1.

the position because the position was only open to people that had an open task book for the TFL at LRO?  Would you agree with that?

A.  If that was the full case, I would agree.  But Mr. Paulin was also deployed in the surge capacity, force capacity, so he would not have been considered because of that reason [even] if he had a TFL title.[119]

Based on this testimony, defendant contends that Paulin cannot show that, but for his EEO activity, he would have been deployed to Hurricane Harvey, as he was "neither qualified nor available."[120]

The Court finds that defendant has presented a legitimate, nondiscriminatory reason for Paulin's non-selection.  Even aside from Paulin's FQS task book status, defendant stated that because Paulin was already deployed to the surge capacity force, he was ineligible for deployment to Hurricane Harvey.  In his opposition, Paulin presents no evidence to contradict these facts.  Indeed, he does not address defendant's assertion that, even if he had a TFL task book, he still would not have been selected for deployment because he was already deployed to the surge capacity force. Plaintiff contests only one of defendant's proffered explanations, his lack of TFL task book, as pretextual.  The Court therefore finds that Paulin has failed to "present facts to rebut each and every legitimate, nondiscriminatory

---

[119]    R. Doc. 42-5 at 11-12 (Williams Deposition at 145:15-146:7).
[120]    R. Doc. 42-1 at 11.

reason advanced by [defendant] in order to survive summary judgment" on his Hurricane Harvey claim.  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (quoting *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 10007 (7th Cir. 2001)).  Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's Hurricane Harvey claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES defendant's motion for summary judgment as to exhaustion.[121]  The Court GRANTS defendant's motion for summary judgment as to liability.[122]  Plaintiff's complaint is DISMISSED.

New Orleans, Louisiana, this __30th__ day of March, 2022.

*Sarah Vance*

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[121]   R. Doc. 41.
[122]   R. Doc. 42.